Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiff Allstate Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ALLSTATE INSURANCE COMPANY,

|  |  |
|---|---|
| Plaintiff, | 14-5410 |
| -against- | Docket No.:_____ (        ) |

WINSTON TAPPER, M.D.,
BROWNSVILLE ADVANCE MEDICAL, P.C.,
MUHAMMAD TAHIR, M.D.,
BRADFORD MEDICAL DIAGNOSTICS, P.C.,
JAYSEKHARAN KOMERATH, M.D.,
CORNELL MEDICAL, P.C.,
JEAN CLAUDE DEMETRIUS, M.D.,
D&H REHABILITATION MEDICAL, P.C.,
FELIX VERSHVOVSKY, M.D.,
FLATBUSH MEDICAL CARE, P.C.,
VICTORIA TSINBERG, M.D., and
SATURN MEDICAL, P.C.

**Plaintiff Demands a
Trial by Jury**

(collectively the "Clinic Defendants")

-and-

ADAM ABDALLA, M.D.,
MIKHAIL ARTAMONOV, M.D., and
DAVID RABINOVICI, M.D.,

(collectively the "EDX Testing Defendants"),

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiff Allstate Insurance Company ("Allstate" or "Plaintiff"), by and through its counsel, Rivkin Radler LLP, as and for its Complaint against the Defendants, hereby alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $3,045,000.00 that the Defendants wrongfully have obtained from Allstate by submitting, and causing to be submitted, thousands of fraudulent charges relating to initial and follow-up examinations, digital range of motion and muscle tests (the "ROM/Muscle Tests"), outcome assessment testing (the "Outcome Assessment Tests"), physical therapy, and electrodiagnostic tests (the "EDX Tests") (collectively the "Fraudulent Services"). The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under Allstate no-fault insurance policies.

2.     The Defendants never had any right to bill for or to collect no-fault benefits for the Fraudulent Services because the Fraudulent Services were medically useless in general, and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols that were designed and employed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to Allstate, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

3.     Accordingly, in addition to damages, Allstate seeks a declaration that it is not legally obligated to pay more than $1,859,000.00 in currently-pending claims for Fraudulent Services submitted by or on behalf of the Defendants because: (i) the Fraudulent Services that were billed to Allstate by or on behalf of the Defendants were not medically necessary and were

2

performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants; (ii) the Fraudulent Services that were billed to Allstate by or on behalf of the Defendants in many cases never were performed in the first instance; (iii) the Fraudulent Services were unreimburseable inasmuch as they were performed – to the extent that they were performed at all – pursuant to kickbacks that the Defendants paid in exchange for patient referrals; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were unreimburseable because they were provided by independent contractors.

4. The Defendants fall into the following categories:

(i) Winston Tapper, M.D. ("Tapper"), Muhammad Tahir, M.D. ("Tahir"), Jayasekharan Komerath, M.D. ("Komerath"), Jean Claude Demetrius, M.D. ("Demetrius"), Felix Vershvovsky, M.D. ("Vershvovsky"), and Victoria Tsinberg, M.D ("Tsinberg") are – with the exception of Demetrius, who recently surrendered his medical license in the face of professional disciplinary charges – physicians licensed to practice medicine in New York, who purport to own the PC Defendants and who purported to perform many of the Fraudulent Services.

(ii) Brownsville Advance Medical, P.C. ("Brownsville"), Bradford Medical, P.C. ("Bradford"), Cornell Medical, P.C. ("Cornell"), D&H Rehabilitation Medical, P.C. ("D&H"), Flatbush Medical Care, P.C. ('Flatbush"), and Saturn Medical, P.C. ("Saturn")(collectively the "PC Defendants" and, with Tapper, Tahir, Komerath, Demetrius, Vershvovsky, and Tsinberg, the "Clinic Defendants") are medical professional corporations, through which the Fraudulent Services purportedly were performed and were billed to insurance companies, including Allstate.

(iii) Adam Abdalla, M.D. ("Abdalla"), Mikhail Artamonov, M.D. ("Artamonov"), and David Rabinovici, M.D. ("Rabinovici"), (collectively the "EDX Testing Defendants") are physicians licensed to practice medicine in New York. The EDX Testing Defendants were associated with the Clinic Defendants and directly involved in the fraudulent scheme perpetrated against Allstate in that they purported to perform the fraudulent EDX Tests and many of the fraudulent examinations with the knowledge that the purported examinations and EDX Tests ultimately would be billed to Allstate and other insurers.

5. As discussed below, the Defendants at all relevant times have known that:

3

(i)    the Fraudulent Services were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to Allstate and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were performed in the first instance;

(iii)    the current procedural terminology ("CPT") codes, or billing codes, used in the billing for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were rendered in order to inflate the charges submitted to Allstate;

(iv)    the Clinic Defendants were ineligible to bill for or to collect No-Fault Benefits in connection with the Fraudulent Services because the Fraudulent Services were performed – to the extent that they were performed at all – pursuant to kickbacks that the Clinic Defendants paid in exchange for patient referrals; and

(v)    the Clinic Defendants were ineligible to bill for or collect No-Fault Benefits for the physical therapy, and EDX Tests, and many of the examinations in the first instance, inasmuch as the physical therapy, EDX Tests, and many of the examinations were performed – to the extent that they were performed at all – by independent contractors, rather than by the Clinic Defendants' employees.

6.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services.

7.    The charts attached hereto as Exhibits "1" through "6" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to Allstate.

8.    The Defendants' respective interrelated schemes began as early as 2008 and have continued uninterrupted since that time.

9.    As a result of the Defendants' interrelated schemes, Allstate has incurred damages of more than $3,045,000.00.

## THE PARTIES

### I.   Plaintiff

10.     Plaintiff Allstate Insurance Company is an Illinois corporation with its principal place of business in Northbrook, Illinois.  Allstate is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

11.     Defendant Tapper resides in and is a citizen of New York. Tapper is a physician who has been licensed to practice medicine in New York since October 29, 1982, purports to own Defendant Brownsville, and also purported to perform EDX Tests at Defendant Bradford.

12.     Tapper has a history of involvement in large-scale no-fault insurance fraud schemes. For instance, on or about January 28, 2014, a federal superseding indictment was unsealed in an action entitled United States v. Zemlyansky, et al., No. 12-cr-00171(JPO) (S.D.N.Y.)(the "Zemlyansky Action"), charging two unlicensed non-physicians, Mikhail Zemlyansky ("Zemlyansky") and Michael Danilovich ("Danilovich"), with participation in a racketeering conspiracy based upon – among other things – their illegal ownership and control of medical clinics that they operated as no-fault insurance fraud mills. A copy of the superseding indictment is annexed hereto as Exhibit "7".

13.     Previously in the Zemlyansky Action, the Government identified Star Medical and Diagnostic PLLC – a medical professional limited liability company that nominally was owned on paper by Tapper – as one of the entities used by Zemlyansky and Danilovich in furtherance of their scheme. A copy of the papers identifying Star Medical and Diagnostic PLLC as one of the entities used by Zemlyansky and Danilovich in furtherance of their scheme, and identifying Tapper as its nominal owner, is annexed hereto as Exhibit "8".

5

14.     Defendant Brownsville is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to insurance companies, including Allstate. Brownsville was incorporated on January 28, 2008, and nominally is owned on paper by Tapper.

15.     Defendant Tahir resides in and is a citizen of New York. Tahir is a physician who has been licensed to practice medicine in New York since August 19, 1996, and purports to own Defendant Bradford.

16.     Defendant Bradford is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to insurance companies, including Allstate. Bradford was incorporated on November 9, 2009, and nominally is owned on paper by Tahir.

17.     Defendant Komerath resides in and is a citizen of New York. Komerath is a physician who has been licensed to practice medicine in New York since February 25, 1977, and purports to own Defendant Cornell.

18.     Defendant Cornell is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to insurance companies, including Allstate.  Cornell was incorporated on March 2, 2005, and nominally is owned on paper by Komerath.

19.     Defendant Demetrius resides in and is a citizen of New York. Demetrius was licensed to practice medicine in New York on March 26, 1984, and purports to own Defendant D&H.

20.     On August 19, 2013, the New York State Board for Professional Medical Conduct (the "State Board") commenced professional disciplinary proceedings against Demetrius. In

6

particular, the State Board charged that – on multiple occasions between October 2009 and May 2010 – Demetrius provided "inappropriate electro-diagnostic interpretations … on nerve conduction results, not, in fact, reflective of the conditions of the respective patients." Based on these charges, the State Board contended that Demetrius had engaged in negligence on more than one occasion and engaged in fraudulent practice.

21.     On August 25, 2013, Demetrius surrendered his New York medical license, after admitting that he could not successfully defend against the State Board charges. Copies of the State Board's charges and Demetrius' agreement to surrender his medical license are annexed hereto as Exhibit "9".

22.     Defendant D&H is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to insurance companies, including Allstate. D&H was incorporated on September 17, 2003, and nominally is owned on paper by Demetrius.

23.     Defendant Vershvovsky resides in and is a citizen of Delaware. Vershvovsky is a physician who has been licensed to practice medicine in New York since January 8, 2008, and purports to own Defendant Flatbush.

24.     Defendant Flatbush is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to insurance companies, including Allstate. Flatbush was incorporated on February 27, 2008, and nominally is owned on paper by Vershvovsky.

25.     Defendant Tsinberg resides in and is a citizen of New York. Tsinberg is a physician who has been licensed to practice medicine in New York since October 28, 1997, and purports to own Defendant Saturn.

26.     Defendant Saturn is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services were billed to insurance companies, including Allstate. Saturn was incorporated on March 10, 2008, and nominally is owned on paper by Tsinberg.

27.     Defendant Abdalla resides in and is a citizen of New Jersey. Abdalla is a physician who has been licensed to practice medicine in New York since April 28, 2005, was associated with Flatbush and Saturn as an independent contractor, and purported to perform many of the Fraudulent Services.

28.     Defendant Artamonov resides in and is a citizen of Pennsylvania. Artamonov is a physician who has been licensed to practice medicine in New York since August 20, 1968, was associated with Flatbush as an independent contractor, and purported to perform many of the Fraudulent Services.

29.     Defendant Rabinovici resides in and is a citizen of New York. Rabinovici is a physician who has been licensed to practice medicine in New York since September 5, 1986, was associated with Cornell as an independent contractor, and purported to perform many of the Fraudulent Services.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States.

31.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

32.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.    **An Overview of the No-Fault Laws and Licensing Statutes**

33.    Allstate underwrites automobile insurance in New York.

34.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

35.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

36.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of

9

Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500" form).

37.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

38.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

39.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

40.     Therefore, under the No-Fault Laws, a physician or medical professional corporation is not eligible to receive No-Fault Benefits if, among other things, the physician or medical professional corporation pays or receives unlawful kickbacks in exchange for patient referrals.

41.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that (i) healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that (ii) insurers may look beyond a facially-valid license in order to determine whether there was a failure to abide by state and local law.

42.      Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

43.      Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

44.      Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to Allstate, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.      The Defendants' Fraudulent Treatment and Billing Scheme

45.      Beginning in 2008, and continuing through the present day, the Defendants have masterminded and implemented a complex series of interrelated fraudulent schemes in which the PC Defendants were used to bill the New York automobile insurance industry millions of dollars

for medically unnecessary services, services that never were provided in the first instance, and services that otherwise were unreimburseable.

### A.     The Kickbacks

46.     The Clinic Defendants do not maintain stand-alone practices, are not the owners or leaseholders in the real property from which they have operated, do not advertise for patients, and do not employ their own support staff.

47.     Rather, the Clinic Defendants have operated through a network of so-called "healthcare clinics" located throughout the greater New York City area (the "Clinics"), including Clinics at the following locations:

(i)      944 North Broadway, Yonkers, New York;

(ii)     145 East 98th Street, Brooklyn, New York;

(iii)    705 East 180th Street, Bronx, New York;

(iv)     1862 East Tremont Avenue, Bronx, New York;

(v)      153-25 Hillside Avenue, Jamaica, New York;

(vi)     2034 Atlantic Avenue, Brooklyn, New York;

(vii)    209-05 Jamaica Avenue, Queens Village, New York;

(viii)   1310 Pugsley Avenue, Bronx, New York;

(ix)     2465 East Tremont Avenue, Bronx, New York;

(x)      2583 Ocean Avenue, Brooklyn, New York;

(xi)     136-18 39th Avenue, Flushing, New York;

(xii)    2100 Flatbush Avenue, Brooklyn, New York;

(xiii)   1152 Broadway, Brooklyn, New York; and

(xiv)    1220 East New York Avenue, Brooklyn, New York.

48.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, these Clinics in actuality are organized to supply "one-stop" shops for no-fault insurance fraud.

49.     These Clinics have provided facilities for the Clinic Defendants, as well as – variously – one or more additional medical professional corporations, chiropractic professional corporations, acupuncture professional corporations, and/or physical therapy professional corporations.

50.     The Clinic Defendants gained access to these Clinics by paying kickbacks to the individuals and entities that controlled the Clinics. The kickbacks were disguised as ostensibly legitimate fees to "lease" space or personnel from the Clinics.  In fact, these were "pay-to-play" arrangements that caused the Clinics to provide access to Insureds and to steer the Insureds to the Defendants for the Fraudulent Services.

51.     In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to one of the PC Defendants for the Fraudulent Services, regardless of individual symptoms, presentment or – in virtually every case – the total absence of any medical problems arising from any automobile accident that would warrant the Fraudulent Services.

52.     The unlawful kickback relationships that the Defendants established with the Clinics were essential to the success of the Defendants' fraudulent scheme.

53.     The Defendants derived significant financial benefit from the relationships because without the access to the Insureds provided by the Clinics, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including Allstate, or generate income from insurance claim payments.

54. The Clinics likewise benefitted from their unlawful kickback relationships with the Defendants through the financial benefit conferred by the kickbacks, themselves, as well as through their ability to use the reports generated by the Defendants to support their own billing for medically unnecessary services.

55. Virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

56. Even so, the Defendants purported to subject virtually every Insured to an identical, medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through the PC Defendants to insurers, including Allstate.

57. The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

58. Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

59. No legitimate physician would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices, nor would any legitimate

physician or other healthcare services provider refer a patient for the fraudulent treatment protocol described below.

60. The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to Allstate and other insurers, and the Clinics referred Insureds to the Defendants for the fraudulent treatment protocol described below because they received kickbacks from the Clinic Defendants and because they sought to use the fraudulent treatment records generated by the Defendants to support their own billing for medically useless services.

**B.     The Fraudulent Initial Examinations**

61. Upon receiving a referral pursuant to the kickbacks paid to the Clinics, the Clinic Defendants and EDX Testing Defendants purported to provide many of the Insureds with an initial examination.

62. The Clinic Defendants and EDX Testing Defendants then typically billed the initial examinations to Allstate under current procedural terminology ("CPT") codes 99245, 99244, or 99205, resulting in a charge of between $154.30 and $230.09 for each initial examination that the Clinic Defendants and EDX Testing Defendants purported to provide.

63. The Clinic Defendants' and EDX Testing Defendants' charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the kickbacks that the Clinic Defendants paid to the Clinics.

64. In cases where the Clinic Defendants and EDX Testing Defendants billed for the initial examinations under CPT codes 99245 or 99244, the charges also were fraudulent in that they misrepresented the nature of the underlying service.

65.    According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT codes 99245 or 99244 represents that the physician performed a consultation at the request of another physician or other appropriate source.

66.    The Clinic Defendants and EDX Testing Defendants did not provide their initial examinations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the initial examinations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent treatment protocol, pursuant to the kickbacks that the Clinic Defendants paid to the Clinics.

67.    Furthermore, the Clinic Defendants' and EDX Testing Defendants' use of CPT codes 99245 and 99244 represented that the physicians who purportedly conducted the examinations submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the examinations in the first instance.

68.    Though the Clinic Defendants and EDX Testing Defendants routinely billed for the initial examinations/consultations under CPT codes 99245 and 99244, the Clinic Defendants and EDX Testing Defendants never submitted any written consultation report to any physician or other referring healthcare provider, because the initial examinations were not conducted at the request of any referring physician or healthcare provider.

69.    Furthermore, the Clinic Defendants' and EDX Testing Defendants' charges for the initial examinations were fraudulent in that they misrepresented the extent of the examinations.

70.    Pursuant to the Fee Schedule, the use of CPT codes 99245, 99244, or 99205 typically requires that the Insured present with problems of moderate to high severity.

71.     Though the Clinic Defendants and EDX Testing Defendants routinely billed for the initial examinations using CPT codes 99245, 99244, or 99205, the Insureds almost never presented with problems of moderate to high severity or even low to moderate severity. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems were of low severity.

72.     For instance, in keeping with the fact that almost all of the accidents giving rise to the Clinic Defendants' and EDX Testing Defendants' billing were minor fender-benders that did not seriously injure the Insureds, in most cases the Insureds did not seek treatment at any hospital as the result of their accidents.  To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours.

73.     Furthermore, in many cases, contemporaneous police reports indicated that no one was injured in the underlying accidents, and that the Insureds' vehicles were drivable following the accidents.

74.     Furthermore, the use of CPT codes 99205 and 99244 typically requires that the physician spend 60 minutes face-to-face with the patient and/or the patient's family, whereas CPT code 99245 typically requires that the physician spend 80 minutes face-to-face with the patient and/or the patient's family.

75.     Though the Clinic Defendants and EDX Testing Defendants routinely billed for the initial examinations under CPT codes 99245, 99244, and 99205, no physician associated with the Clinic Defendants ever spent 60 minutes, much less 80 minutes, on the initial examinations. Rather, the initial examinations rarely lasted more than 15 minutes, to the extent that they were conducted at all.

17

76.     In keeping with the fact that the initial examinations rarely lasted more than 15 minutes, the Clinic Defendants and EDX Testing Defendants used boilerplate template and checklist forms in conducting the initial examinations with respect to each of the claims identified in Exhibits "1" – "6". Representative examples of the boilerplate template and checklist forms collectively are annexed hereto as Exhibit "10".

77.     The boilerplate template and checklist forms that the Clinic Defendants and EDX Testing Defendants used in conducting the initial examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations. See Exhibit "10".

78.     All that was required to complete the boilerplate template and checklist forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing. See Exhibit "10".

79.     These interviews and examinations did not require any physicians associated with the Clinic Defendants to spend more than 15 minutes of face-to-face time with the Insureds.

80.     In addition, pursuant to the Fee Schedule, when the Clinic Defendants and EDX Testing Defendants submitted charges under CPT codes 99245 and 99205, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "high complexity".

81.     Pursuant to the Fee Schedule, when the Clinic Defendants and EDX Testing Defendants submitted charges under CPT code 99244, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

18

82.     Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

83.     The Fee Schedule identifies the following organ systems: (i) eyes; (ii) ears, nose, mouth, and throat; (iii) cardiovascular; (iv) respiratory; (v) gastrointestinal; (vi) genitourinary; (vii) musculoskeletal; (viii) skin; (ix) neurologic; (x) psychiatric; and (xi) hematologic/lymphatic/immunologic.

84.     Though the Clinic Defendants and EDX Testing Defendants routinely billed for the initial examinations under CPT codes 99245, 99244, and 99205, and therefore falsely represented that they conducted a "comprehensive" physical examination of Insureds during the initial examinations, they never conducted a general examination of multiple organ systems, nor did they conduct a complete examination of a single organ system.

85.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, medical decision-making does not qualify as "highly complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of an extensive number of diagnoses or management options; (ii) review of either an extensive amount of data or data that are extensively complex; and/or (iii) presenting problems that carry a high risk of complications and/or morbidity or mortality.

86.     Along similar lines, pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii)

review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

87.    Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician. In addition, pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed.  Furthermore, pursuant to the CPT Assistant, the risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

88.    The Clinic Defendants and EDX Testing Defendants billed for the initial examinations in each of the claims identified in Exhibits "1" – "6" under CPT codes 99245, 99244, or 99205, and thereby falsely represented that they engaged in either highly or moderately complex medical decision-making with respect to the Insureds they purported to treat during the initial examinations.

89.    In fact, with respect to the claims identified in Exhibits "1"- "6", the Clinic Defendants and EDX Testing Defendants never engaged in moderately complex medical decision-making, much less highly complex medical decision-making, because they did not ever review an extensive or moderate amount of data or data that were moderately or extensively complex.

90.    For instance, in each of the claims identified in Exhibits "1" – "6", the initial examination reports indicated that the Clinic Defendants and EDX Testing Defendants – at most

– reviewed MRI studies and ordered ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests, which are not at all complex for a qualified physician to perform or interpret.

91.     Furthermore, with respect to the claims identified in Exhibits "1" – "6", there was no risk of significant complications, morbidity, or mortality – much less a high or moderate risk – from the Insureds' relatively minor medical complaints of back pain, neck pain, or pain in their limbs, to the limited extent that they ever had any medical complaints arising from automobile accidents at all.

92.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Clinic Defendants and EDX Testing Defendants, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

93.     In almost every instance, the only diagnostic procedures and "treatments" that the Clinic Defendants and EDX Testing Defendants actually provided were limited to a series of medically unnecessary diagnostic tests (i.e., ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests), and physical therapy, none of which are health- or life-threatening if properly administered.

94.     In fact, the Clinic Defendants and EDX Testing Defendants did not engage in any medical decision-making at all with respect to the claims identified in Exhibits "1" – "6".

95.     Rather, the outcome of the initial examinations was pre-determined for virtually every Insured to result in phony boilerplate "diagnoses" of sprains/strains and contusions.

96.     In the claims identified in Exhibits "1" – "6", the Clinic Defendants and EDX Testing Defendants falsely diagnosed the Insureds with sprains/strains and contusions solely as a

false basis to order and bill for ROM/Muscle Tests, physical therapy, EDX Tests, and Outcome Assessment Tests.

### C.       The Fraudulent Follow-Up Examinations

97.      In addition to the fraudulent initial examinations, the Clinic Defendants typically purported to subject Insureds to two or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

98.       The Clinic Defendants then virtually always billed the follow-up examinations to Allstate either under CPT codes 99244, 99215, or 99214, resulting in a charge of between $71.49 and 182.18 for each follow-up examination that the Clinic Defendants purported to provide.

99.      In cases where the Clinic Defendants billed for the follow-up examinations under CPT code 99244, the charges were fraudulent in that they misrepresented the nature of the follow-up examinations.

100.     Pursuant to the Fee Schedule, the use of CPT code 99244 represents that the physician performed a consultation at the request of another physician or other appropriate source.

101.     The Clinic Defendants did not provide their follow-up examinations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the follow-up examinations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent treatment protocol, pursuant to the kickbacks that the Clinic Defendants paid to the Clinics.

102.     Furthermore, the Clinic Defendants' use of CPT code 99244 represented that the physicians who purportedly conducted the follow-up examinations submitted a written

22

consultation report to the physicians or other appropriate sources who purportedly requested the examinations in the first instance.

103.   Though the Clinic Defendants routinely billed for the follow-up examinations under CPT code 99244, the Clinic Defendants never submitted any written consultation report to any physician or other referring healthcare provider, because the follow-up examinations were not conducted at the request of any referring physician or healthcare provider.

104.   Furthermore, the Clinic Defendants' charges for the follow-up examinations were fraudulent in that they misrepresented the extent of the examinations.

105.   Pursuant to the Fee Schedule, the use of CPT codes 99244, 99215, or 99214 typically requires that the Insured present with problems of moderate to high severity.

106.   Though the Clinic Defendants routinely billed for the follow-up examinations using CPT codes 99244, 99215, or 99214, the Insureds almost never presented with problems of moderate to high severity or even low to moderate severity. Rather, to the extent that the Insureds had any problems at all as the result of any automobile accidents, the problems were of low severity.

107.   For instance, in keeping with the fact that almost all of the accidents giving rise to the Clinic Defendants' billing were minor fender-benders that did not seriously injure the Insureds, in most cases the Insureds did not seek treatment at any hospital as the result of their accidents.  To the limited extent that the Insureds did report to a hospital, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours.

108.   Furthermore, in many cases, contemporaneous police reports indicated that no one was injured in the underlying accidents, and that the Insureds' vehicles were drivable following the accidents.

23

109.    Furthermore, the use of CPT code 99244 typically requires that the physician spend 60 minutes face-to-face with the patient and/or the patient's family, whereas the use of CPT code 99215 typically requires that the physician spend 40 minutes face-to-face with the patient and/or the patient's family, and the use of CPT code 99214 typically requires that the physician spend 25 minutes face-to-face with the patient and/or the patient's family.

110.    Though the Clinic Defendants routinely billed for the follow-up examinations under CPT codes 99244, 99215, or 99214, no physician associated with the Clinic Defendants ever spent 25 minutes, much less 40 or 60 minutes, on the follow-up examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

111.    In keeping with the fact that the follow-up examinations rarely lasted more than 10 minutes, the Clinic Defendants used pre-printed template and checklist forms in conducting the follow-up examinations with respect to each of the claims identified in Exhibits "1" – "6". Representative examples of the boilerplate template and checklist forms collectively are annexed hereto as Exhibit "11".

112.    The boilerplate template and checklist forms that the Clinic Defendants used in conducting the follow-up examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations. See Exhibit "11".

113.    All that was required to complete the boilerplate template and checklist forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing. See Exhibit "11".

24

114.     These interviews and examinations did not require any physicians associated with the Clinic Defendants to spend more than 10 minutes of face-to-face time with the Insureds.

115.     In addition, pursuant to the Fee Schedule, when the Clinic Defendants submitted charges under CPT code 99215, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "high complexity".

116.     Pursuant to the Fee Schedule, when the Clinic Defendants submitted charges under CPT codes 99244, they falsely represented that they: (i) conducted a "comprehensive" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

117.     Pursuant to the Fee Schedule, when the Clinic Defendants submitted charges under CPT code 99214, they falsely represented that they: (i) conducted a "detailed" physical examination; and (ii) engaged in medical decision-making of "moderate complexity".

118.     Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

119.     Pursuant to the Fee Schedule, a physical examination does not qualify as "detailed" unless the healthcare provider conducts an extended examination of the affected body areas and other symptomatic or related organ systems.

120.     Though the Clinic Defendants routinely billed for the follow-up examinations under CPT codes 99215 and 99244, and therefore falsely represented that they conducted a "comprehensive" physical examination of Insureds during the follow-up examinations, they

never conducted a general examination of multiple organ systems, nor did they conduct a complete examination of a single organ system.

121.    Though the Clinic Defendants routinely billed for the follow-up examinations under CPT code 99214, and therefore falsely represented that they conducted a "detailed" physical examination of Insureds during the follow-up examinations, they never conducted an extended examination of the affected body areas and other symptomatic or related organ systems

122.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, medical decision-making does not qualify as "highly complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of an extensive number of diagnoses or management options; (ii) review of either an extensive amount of data or data that are extensively complex; and/or (iii) presenting problems that carry a high risk of complications and/or morbidity or mortality.

123.    Along similar lines, pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii) review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

124.    Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician.

125.    Pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed.

126.    Pursuant to the CPT Assistant, the risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

127.    The Clinic Defendants billed for the follow-up examinations in each of the claims identified in Exhibits "1" – "6" under CPT codes 99215, 99244, and 99214, and thereby falsely represented that they engaged in either highly or moderately complex medical decision-making with respect to the Insureds they purported to treat during the follow-up examinations.

128.    In fact, with respect to the claims identified in Exhibits "1"- "6", the Clinic Defendants never engaged in moderately complex medical decision-making, much less highly complex medical decision-making, because they did not ever review an extensive or moderate amount of data or data that were moderately or extensively complex.

129.    For instance, in each of the claims identified in Exhibits "1" – "6", the follow-up examination reports indicated that the Clinic Defendants – at most – reviewed MRI studies and ordered ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests, which are not at all complex for a qualified physician to perform or interpret.

130.    Furthermore, with respect to the claims identified in Exhibits "1" – "6", there was no risk of significant complications, morbidity, or mortality – much less a high or moderate risk – from the Insureds' relatively minor medical complaints of back pain, neck pain, or pain in their limbs, to the limited extent that they ever had any medical complaints arising from automobile accidents at all.

131.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Clinic Defendants, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

132.    In almost every instance, the only diagnostic procedures and "treatments" that the Clinic Defendants actually provided were limited to a series of medically unnecessary diagnostic tests (i.e., ROM/Muscle Tests, EDX Tests, and Outcome Assessment Tests), and physical therapy, none of which are health- or life-threatening if properly administered.

133.    In fact, the Clinic Defendants did not engage in any medical decision-making at all with respect to the claims identified in Exhibits "1" – "6".

134.    Rather, the outcome of the follow-up examinations was pre-determined for virtually every Insured to reiterate the phony boilerplate "diagnoses" of sprains/strains and contusions that were provided to the Insureds during the initial examinations.

135.    In the claims identified in Exhibits "1" – "6", the Clinic Defendants falsely reiterated the phony boilerplate diagnoses sprains/strains and contusions solely as a false basis to order and bill for ROM/Muscle Tests, physical therapy, Consultations, EDX Tests, and Outcome Assessment Tests.

### D.    The Fraudulent Unbundling of Examinations and Billing for Outcome Assessment Tests

136.    In many cases, Demetrius, D&H, Komerath, and Cornell (collectively the "Outcome Assessment Defendants") fraudulently unbundled their charges for the initial and follow-up examinations, by submitting a separate charge of $157.17 under CPT code 99358 for

28

Outcome Assessment Tests provided contemporaneously with the initial and follow-up examinations.

137.    The Outcome Assessment Tests that the Outcome Assessment Defendants purported to provide to Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing and the impact of those symptoms on their lives. The Insureds' responses to the questionnaires then were fed into a computer, which automatically generated a report that rated the Insureds' responses according to pre-set criteria. Representative examples of the questionnaires and resulting reports are annexed hereto as Exhibit "12".

138.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the Outcome Assessment Tests that the Outcome Assessment Defendants purported to provide were nothing more than questionnaires regarding the Insureds' history and physical condition, the Fee Schedule provides that the Outcome Assessment Tests are to be reimbursed as an element of the initial examinations and follow-up examinations.

139.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for the type of contemporaneously-provided Outcome Assessment Tests that the Outcome Assessment Defendants purported to provide.

140.    The information gained through the use of the Outcome Assessment Tests that the Outcome Assessment Defendants purported to provide was not significantly different from the information that the Outcome Assessment Defendants purported to obtain during virtually every Insured's initial examination and follow-up examinations.

29

141.    Under the circumstances employed by the Outcome Assessment Defendants, the Outcome Assessment Tests represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the virtually every Insured's initial examination and follow-up examination.

142.    The Outcome Assessment Tests were part and parcel of the Outcome Assessment Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Outcome Assessment Defendants.

143.    The Outcome Assessment Defendants' use of CPT code 99358 to bill for the Outcome Assessment Tests also constituted a deliberate misrepresentation of the extent of the service that was provided.

144.    Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that a physician actually has spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

145.    Though the Outcome Assessment Defendants routinely submitted billing for the Outcome Assessment Tests under CPT code 99358, they did not spend any time whatsoever reviewing or administering the tests, much less one hour.

146.    Upon information and belief, the Outcome Assessment Defendants' charges for the Outcome Assessment Tests also misrepresented the identity of the individual who performed the Outcome Assessment Tests.

147.    Pursuant to the Fee Schedule, the use of CPT code 99358 represents that the underlying service actually was performed by a physician or other licensed healthcare provider,

30

and all of the Outcome Assessment Defendants' charges for "outcome assessment testing" represented that a licensed physician performed the underlying service.

148.   However, the Outcome Assessment Tests did not require any physician involvement whatsoever. Rather, the Insureds completed the pre-printed questionnaires, and a computer automatically generated a report that rated the Insureds' responses according to pre-set criteria.

149.   The Outcome Assessment Defendants misrepresented that licensed physicians had some role in the performance of the tests in order to support their charges under CPT code 99358, when in fact the charges for the Outcome Assessment Tests were unreimburseable under CPT code 99358 because the tests were not performed by physicians.

**E.     The Fraudulent ROM/Muscle Tests**

150.   In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations, Tsinberg, Saturn, Komerath, Cornell, Demetrius, D&H, Vershvovsky, and Flatbush (collectively the "ROM Defendants") instructed most Insureds to return for one or more rounds of medically useless ROM/Muscle Tests. The charges for the computerized ROM/Muscle Tests were fraudulent in that the computerized ROM tests were medically unnecessary and were performed pursuant to the ROM Defendants' fraudulent treatment protocol.

151.   Like the ROM Defendants' charges for the other Fraudulent Services they purported to provide, the charges for the ROM/Muscle Tests were fraudulent in that the ROM/Muscle Tests  were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that the ROM Defendants paid to the Clinics.

31

1.   **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

152.   The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

153.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

154.   A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

155.   Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

156.    Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with the ROM Defendants – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries.  Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

157.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial consultation, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

158.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided ROM/Muscle Tests.

**2.      The ROM Defendants Duplicate Billing for Medically Unnecessary ROM/Muscle Tests**

159.    To the extent that the ROM Defendants actually provided initial examinations and follow-up examinations in the first instance, the ROM Defendants conducted manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

160.    The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that the ROM Defendants routinely submitted for the initial

examinations under CPT codes 99205, 99244, and 99245, and for the follow-up examinations under CPT codes 99215, 99214, and 99244.

161.   Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by Allstate as a component of reimbursement for the initial examinations and/or follow-up examinations, the ROM Defendants systemically billed for, and purported to perform, a series of computerized ROM/Muscle Tests on most Insureds.

162.   Though the Insureds routinely visited the Clinics several times per month for follow-up examinations and other Fraudulent Services, the ROM Defendants often deliberately scheduled separate appointments for computerized range of motion and muscle tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

163.   The ROM Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.   The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

164.   The ROM Defendants purported to have provided the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As

34

with the computerized ROM tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

165.    The information gained through the use of the computerized ROM tests and muscle tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

166.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless. This is evidenced by the fact that the ROM Defendants never incorporated the results of computerized ROM/Muscle Tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

167.    The computerized ROM tests and muscle tests were part and parcel of the ROM Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the ROM Defendants.

3. **The ROM Defendants' Fraudulent Unbundling of Charges for ROM/Muscle Tests**

168. Not only did the ROM Defendants deliberately conduct duplicative, medically unnecessary ROM/Muscle Tests, they also unbundled the tests in order to maximize the fraudulent charges that they could submit, or cause to be submitted, to Allstate.

169. Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

170. CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed.

171. Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750, resulting in total charges of $91.42. If the provider performed 45 minutes of computerized range of motion and muscle testing, it would be permitted to submit three charges of $45.71 under CPT code 97750, resulting in total charges of $137.13, and so forth.

172. The ROM Defendants virtually always purported to provide computerized range of motion and muscle tests to Insureds on the same dates of service.

173. To the extent that the ROM Defendants actually provided the ROM/Muscle Tests to Insureds in the first instance, the ROM/Muscle Tests – together – never took more than 15 minutes to perform.

174.    Thus, even if the ROM/Muscle Tests that the ROM Defendants purported to perform were medically necessary, and performed in the first instance, they would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

175.    In order to maximize their fraudulent billing for the ROM/Muscle Tests, the ROM Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $45.71 under CPT code 95831 (for the muscle tests); and multiple charges of $43.60 under CPT code 95851 (for the range of motion tests).

176.    By unbundling what should – at most – have been single $45.71 charges under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, the ROM Defendants generally submitted charges in excess of $300.00, and often submitted charges in excess of $600.00, for each round of computerized range of motion and muscle testing they purported to provide.

**F.    The Fraudulent EDX Tests**

177.    The Clinic Defendants and EDX Testing Defendants also purported to subject most Insureds to a series of medically unnecessary EDX Tests, consisting of electromyography ("EMG") tests and nerve conduction velocity ("NCV") tests.

178.    Like the charges for the other Fraudulent Services, the charges for the EDX Tests were fraudulent in that the EDX Tests were medically unnecessary and were performed pursuant to the Defendants' pre-determined fraudulent treatment protocol and the kickbacks that the Defendants paid to the Clinics.

37

1.      **The Human Nervous System and Electrodiagnostic Testing**

179.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

180.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hand and feet through the arms and legs.

181.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

182.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

183.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy

38

(the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "13."

184.    According to the Recommended Policy, NCV tests should be performed directly by a physician or performed by a trained individual under the direct supervision of a physician.

185.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. See Exhibit "13."

186.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs. See Exhibit "13."

### 2.    The Fraudulent NCVs

187.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

188.   In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

189.   There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

190.   F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

191.   Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95089 for each sensory nerve in any limb on which NCVs test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which NCVs test is performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that is performed on the nerves of any limb.

192.   In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Clinic Defendants and EDX Testing Defendants routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to Allstate and other insurers, the Defendants

routinely purported to perform and/or provide: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; as well as (iii) multiple H-reflex studies.

193.    In many cases, Brownsville, Tapper, Cornell, Komerath. Rabinovici, Flatbush, Vershvovsky, Artamonov, D&H, and Demetrius concealed the fact that they routinely purported to test far more nerves than recommended by the Recommended Policy, by splitting their NCV test charges onto two separate bills.

194.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

195.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

196.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

See Exhibit "13".

197.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

198.    The Clinic Defendants and EDX Testing Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

199.   Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibits "1" – "6".

200.   In particular, the Clinic Defendants and EDX Testing Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all 18 of them – in virtually all of the claims identified in Exhibits "1" – "6":

    (i)    left and right median motor nerves;

    (ii)    left and right ulnar motor nerves;

    (iii)    left and right peroneal motor nerves;

    (iv)    left and right tibial motor nerves;

    (v)    left and right superficial peroneal sensory nerves;

    (vi)    left and right sural sensory nerves;

    (vii)    left and right median sensory nerves;

    (viii)   left and right radial sensory nerves;

    (ix)    left and right ulnar sensory nerves;

201.   The cookie-cutter approach to the NCVs that the Clinic Defendants and EDX Testing Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that the Clinic Defendants and EDX Testing Defendants could submit to Allstate and other insurers, and to maximize their ill-gotten profits.

202.   In many cases, the Clinic Defendants and EDX Testing Defendants never provided the billed-for NCVs in the first instance, and instead simply compiled phony NCV test

reports for the Insureds so as to make it appear as if the NCVs had been performed, when in fact they had not.

203.    NCV test results are contained in reports that display numeric values for each category of nerve measurements that are taken during NCVs test – i.e., conduction velocity, amplitude, latency, etc.

204.    The NCV reports also contain graphic waveforms, from which the numeric values for each category of nerve measurements are derived.

205.    Each waveform and numeric value is specific to a given nerve's electrical characteristics at the moment the measurement is taken.

206.    Each waveform is unique. Even if the same nerve, on the same person, was retested moments later, the resulting waveforms and data would be somewhat different.

207.    In order for the waveforms and data from two different NCV studies to be identical, the electrical currents measured at the recording electrodes affixed to each different patient would have to be identical to the microsecond for the entire duration of the test. It is physiologically impossible for this to occur even a single time.

208.    Therefore, the set of values and waveforms for each nerve that are reported in NCV reports represent the unique "fingerprints" of an patient's nerves under specific conditions at a specific moment in time.

209.    To further defraud Allstate, the Clinic Defendants and EDX Testing Defendants routinely created and submitted NCV reports containing waveforms and numerical data that were duplicated across several patients, by copying the data from a pre-existing NCV report for one patient, then pasting it into NCV reports created for new patients. Then, they billed Allstate for these fabricated, phony NCV reports.

43

210.    The Clinic Defendants and EDX Testing Defendants created and sent these reports to Allstate as evidence that they performed the tests and as a representation of the Insureds' medical conditions. Accordingly, each report misrepresented, among other things: (i) that the NCV test was performed; (ii) that the transmitted NCV test results displayed the results of the Insureds' tests; and (iii) that the purported findings were true representations of the Insureds' respective conditions.

211.    Allstate commissioned a review of the Defendants' NCV submissions by Randall L. Braddom, M.D., M.S., ("Dr. Braddom"), an expert on electro-diagnostic testing.

212.    Dr. Braddom determined that the NCV tests were not performed up to the appropriate standard of medical care and that, in support of their billing, the Defendants repeatedly submitted identical NCV waveforms and data for different patients, a medical impossibility that conclusively demonstrates fraud.

213.    For example, Dr. Braddom identified the following Match Groups:

(i)     <u>Match Group One</u> – Demetrius purportedly performed NCVs on a patient named Patient "1" at D&H on December 4, 2009. After reviewing the NCV reports that D&H and Demetrius submitted in support of their billing, Dr. Braddom determined that there was complete duplication of <u>all</u> NCV data and waveforms between Patient "1" and a patient named Patient "2", on whom Tapper purportedly performed NCVs at Brownsville, on December 5, 2008. Patient "1"'s and "2"'s upper extremity waveforms also matched exactly with NCVs purportedly performed by Artamonov at Flatbush on January 23, 2009 for a patient named Patient "3". Patient "1"'s and "2"'s upper extremity waveforms also matched 12 of 14 waveforms in NCVs purportedly performed by Tapper at Brownsville on August 21, 2008 for a patient named Patient "4". Furthermore, Patient "1"'s and "2"'s lower extremity waveforms matched 15 of 16 waveforms in NCVs purportedly performed by Tapper at Brownsville on October 3, 2008 for a patient named Patient "5".

(ii)    <u>Match Group Two</u> – Demetrius purportedly performed NCVs on a patient named Patient "6" at D&H on October 30, 2009. After reviewing the NCV reports that D&H and Demetrius submitted in support of their billing, Dr.

Braddom determined that there was complete duplication of all upper extremity studies between Patient "6" and a patient named Patient "7", on whom Tapper purportedly performed NCVs at Brownsville, on December 5, 2008. Patient "6"'s and "7"'s upper extremity waveforms also matched 11 out of 14 waveforms in NCVs purportedly performed by Tapper at Brownsville on August 21, 2008 for a patient named Patient "8".

(iii)   Match Group Three – Demetrius purportedly performed NCVs on a patient named Patient "9" at D&H on January 8, 2010. After reviewing the NCV reports that D&H and Demetrius submitted in support of their billing, Dr. Braddom determined that there was complete duplication of all upper extremity waveforms and data studies between Patient "9" and a patient named Patient "10", on whom Tapper purportedly performed NCVs at Brownsville, on March 26, 2010.

(iv)   Match Group Four – Demetrius purportedly performed NCVs on a patient named Patient "11" at D&H on December 4, 2009. After reviewing the NCV reports that D&H and Demetrius submitted in support of their billing, Dr. Braddom determined that there was complete duplication of all upper extremity waveforms and data studies between Patient "11" and a patient named Patient "12", on whom Tapper purportedly performed NCVs at Brownsville, on September 25, 2010. Patient "12" also had matches on six out of 14 waveforms in NCVs purportedly performed by Tapper at Brownsville on December 17, 2008.

(v)   Match Group Five – Demetrius purportedly performed NCVs on a patient named Patient "13" at D&H on June 4, 2009. After reviewing the NCV reports that D&H and Demetrius submitted in support of their billing, Dr. Braddom determined that three of Patient "13"'s 14 upper extremity waveforms were an exact match for a patient named Patient "14", on whom Tapper purportedly performed NCVs at Brownsville on September 25, 2008.

(vi)   Match Group Six – Demetrius purportedly performed NCVs on a patient named Patient "15" at D&H on April 30, 2009. After reviewing the NCV reports that D&H and Demetrius submitted in support of their billing, Dr. Braddom determined that most of Patient "15"'s upper extremity waveforms were an exact match for a patient named Patient "16", on whom Artamonov purportedly performed NCVs at Flatbush on January 16, 2009. Additionally, five of Patient "15"'s lower extremity waveforms were an exact match for lower extremity waveforms in NCVs purportedly provided by Tapper at Brownsville on August 21, 2008 for a patient named Patient "17".

45

214.    Allstate identified additional, medically impossible matching data and waveforms among the Defendants' purported NCV test results. Specifically:

(i)     <u>Match Group Seven</u> – On January 7, 2010, Tapper purportedly performed NCVs on a patient named Patient "18" at Bradford. These purported NCVs resulted in data that matched data in a May 13, 2010 NCV test purportedly performed by Tapper at Brownsville on a patient named Patient "19".

(ii)    <u>Match Group Eight</u> –On October 28, 2009, Tapper purportedly performed NCVs on a named Patient "20" at Bradford. These purported NCVs resulted in data that matched data in a June 12, 2008 NCV test purportedly performed by Rabinovici at Cornell on a patient named Patient "21". Additionally, the purported NCV results for Patients "20" and "21" contained data that matched data in an August 21, 2008 NCV test purportedly performed by Tapper at Brownsville on a patient named Patient "22".

(iii)   <u>Match Group Nine</u> – On January 7, 2010, Tapper purportedly performed NCVs on a patient named Patient "23" at Bradford. These purported NCVs resulted in data and waveforms that matched data and waveforms in a December 21, 2009 NCV test purportedly performed by Tapper at Bradford on a patient named Patient "24".

(iv)    <u>Match Group Ten</u> – On December 14, 2009, Tapper purportedly performed NCVs on a patient named Patient "25" at Bradford. These purported NCVs resulted in waveforms that matched waveforms in a February 22, 2010 NCV test purportedly performed by Abdalla at Saturn on a patient named Patient "26".

(v)     <u>Match Group Eleven</u> – On April 15, 2009, Abdalla purportedly performed NCVs on a patient named Patient "27" at Flatbush. These purported NCVs resulted in data that matched data in an August 14, 2008 NCV test purportedly performed by Rabinovici at Cornell on a patient named Patient "28, as well as data in a January 23, 2009 NCV test purportedly performed by Artamonov at Flatbush on a patient named Patient "29".

(vi)    <u>Match Group Twelve</u> – On November 12, 2009, Abdalla purportedly performed NCVs on a patient named Patient "30" at Saturn. These purported NCVs resulted om data and waveforms that matched data and waveforms in an April 19, 2010 NCV test purportedly performed by Abdalla at Saturn on a patient named Patient "31".

215.    In addition to the specific examples described above, Dr. Braddom and Allstate identified many other instances in which the Defendants created phony NCV test results by cutting and pasting data and waveforms from pre-existing reports into the reports for new patients.

216.    These matching data and waveforms confirm that the Defendants drew from a "stock" of NCV data and waveform images that they randomly assembled and combined with the Insureds' claim information to create the false impression that their NCV reports represented valid testing and test results.

### 3.    The Fraudulent EMGs

217.    EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, and muscles.

218.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.

219.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

220.    The Defendants did not tailor the EMG tests they purported to perform and/or provide to the unique circumstances of each patient. Instead, they routinely purported to test the

same muscles in the same limbs over and over again, without regard for individual patient presentation.

221.   Furthermore, even if there was need for any of these EMGs, the nature and number of the EMGs that the Defendants generally purported to perform and/or provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. In most cases, The Defendants purported to perform and/or provide EMGs on four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to Allstate and other insurers.

222.   More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

223.   The Defendants frequently purported to perform and/or provide EMGs on muscles in all four limbs for the vast majority of Insureds solely to maximize the profits that they could reap from each such Insured.

224.   Not only did the Defendants routinely purport to provide four-limb EMGs to Insureds, in many cases Brownsville, Tapper, Cornell, Komerath, Rabinovici, Flatbush, Vershvovsky, Artamonov, D&H, and Demetrius unbundled their four-limb EMG charges into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG

48

charge of $408.64, in order to maximize their fraudulent EMG billing and conceal the fact that

they were providing four-limb EMGs to Insureds in contravention of the Recommended Policy.

225.    Allstate commissioned a review by Dr. Braddom of EMG submissions made by

the Defendants. Like the review of the NCV studies, Dr. Braddom determined that the

Defendants performed the EMG tests below the appropriate standard of medical care and utilized

a pre-determined protocol in an attempt to maximize the billing submitted to Allstate.

226.    In particular, Dr. Braddom concluded – among other things – that:

(i)     The Defendants routinely tested the same groups of muscles in the same limbs over and over again, to an extent that exceeded any statistical likelihood that the individual patients had presented with symptoms that required such identical EMG testing;

(ii)    In the majority of cases, the Defendants conducted incomplete EMGs, which nonetheless were billed to Allstate as complete and properly performed. In order to submit a charge to Allstate or other insurers, the Defendants were required to test at least five muscles per extremity for each Insured.  Even so, the Defendants typically tested less than five muscles per extremity.

(iii)   In many cases, the actual possible levels of radiculopathy based on the EMG reports did not correlate to the specific radiculopathies purportedly diagnosed by the Defendants. In these cases, the proper standard of care would have been to sample additional muscles in order to identify the possible roots most likely to be causing the radiculopathy.  However, the Defendants did not alter their EMG tests or sample additional muscles.

(iv)    In many cases, the Defendants inappropriately made a diagnosis of radiculopathy when the EMGs did not reveal commensurate abnormalities.

(v)     Furthermore, in diagnosing radiculopathies electromyographers use changes in muscle electrical activity observed on EMG needle examinations. Typically, motor unit recruitment in limb muscles is one of the earliest observed changes. Recruitment cannot reasonably be determined in the paraspinal muscles. However, the Defendants often reported that they read recruitment in the paraspinal muscles.

**4.    The Defendants' Fraudulent Radiculopathy Diagnoses**

227.   Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

228.   Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

229.   As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

230.   Virtually none of the Insureds whom the Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

231.   Even so, the EDX Testing Defendants purported to diagnose radiculopathies in the majority of the Insureds to whom they purported to provide EDX testing.

232.   Additionally, the Defendants routinely over-diagnosed Insureds with multi-level radiculopathies, which are even rarer in automobile accident victims than single-level radiculopathies.

233.   The Defendants purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that they purported to provide.

50

### G.     The Fraudulent Physical Therapy

234.    In addition to the other Fraudulent Services that the Defendants purported to provide, Saturn, Tsinberg, Flatbush, Vershvovsky, D&H, Demetrius, Cornell, Komerath, Brownsville, Tapper, Bradford, and Tahir (collectively the "PT Defendants") purported to subject most Insureds to a series of medically unnecessary physical therapy treatments.

235.    In most cases, the PT Defendants purported to subject each Insured to multiple physical therapy treatments over a period of several weeks, generally resulting in hundreds of dollars of charges for each Insured.

236.    Like the charges for the other Fraudulent Services, the PT Defendants' charges for the physical therapy were fraudulent in that the physical therapy was medically unnecessary and was performed pursuant to the PT Defendants' pre-determined fraudulent treatment protocol and the kickbacks that the PT Defendants paid to the Clinics.

237.    The PT Defendants' charges for the physical therapy were predicated on the phony boilerplate "diagnoses" they provided to the Insureds following the initial and follow-up examinations, as well as the medically useless and fraudulent EDX Tests that they purported to perform and/or provide.

238.    But for these ersatz "diagnoses" and phony EDX Tests, the PT Defendants never would have been able to submit charges for the physical therapy in the first instance, because they would have no way to justify the performance of the physical therapy.

### H.     The Fraudulent Billing for Independent Contractors

239.    The Clinic Defendants' fraudulent scheme also included submission of claims to Allstate seeking payment for services performed by independent contractors.

240.    Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

241.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "14").

242.    Tapper was the only healthcare provider employed by Brownsville.

243.    Tahir was the only healthcare provider employed by Bradford.

244. Komerath was the only healthcare provider employed by Cornell.

245. Demetrius was the only healthcare provider employed by D&H.

246. Vershvovsky was the only healthcare provider employed by Flatbush.

247. Tsinberg was the only healthcare provider employed by Saturn.

248. Even so, the Clinic Defendants routinely submitted charges to Allstate and other insurers for Fraudulent Services performed by healthcare providers other than Tapper, Tahir, Komerath, Demetrius, Vershvovsky, and Tsinberg, including but not limited to the EDX Testing Defendants.

249. To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than Tapper, Tahir, Komerath, Demetrius, Vershvovsky, and Tsinberg were performed by physicians, physical therapists, acupuncturists, and unlicensed technicians whom the Clinic Defendants treated as independent contractors.

250. For instance, the Clinic Defendants:

    (i)     paid the physicians, physical therapists, acupuncturists, and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

    (ii)    established an understanding with the physicians, physical therapists, acupuncturists, and unlicensed technicians that they were independent contractors, rather than employees;

    (iii)   paid no employee benefits to the physicians, physical therapists, acupuncturists, and unlicensed technicians;

    (iv)   failed to secure and maintain W-4 or I-9 forms for the physicians, physical therapists, acupuncturists, and unlicensed technicians;

    (v)    failed to withhold federal, state or city taxes on behalf of the physicians, physical therapists, acupuncturists, and unlicensed technicians;

    (vi)   compelled the physicians, physical therapists, acupuncturists, and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted the physicians, physical therapists, acupuncturists, and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted the physicians, physical therapists, acupuncturists, and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)     failed to cover the physicians, physical therapists, acupuncturists, and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, physical therapists, acupuncturists, and unlicensed technicians were independent contractors.

251.    By electing to treat the physicians, chiropractors, physical therapists, acupuncturists, and unlicensed technicians as independent contractors, the Clinic Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the physicians, physical therapists, acupuncturists, and unlicensed technicians.

252.    Because the physicians, physical therapists, acupuncturists, and unlicensed technicians were independent contractors and performed the Fraudulent Services, the Clinic

Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

253.    The Clinic Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Clinic Defendants to make it appear as if the services were eligible for reimbursement. The Clinic Defendants' misrepresentations were consciously designed to mislead Allstate into believing that it was obligated to pay for these services, when in fact Allstate was not.

**III.    The Fraudulent Billing the Defendants Submitted to Allstate**

254.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to Allstate seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

255.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to Allstate by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Allstate that the Fraudulent Services were medically necessary and, in many cases, misrepresented to Allstate that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Allstate that the Clinic Defendants were in compliance with all material licensing laws

and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Clinic Defendants were not in compliance with all material licensing laws in that they paid kickbacks for patient referrals.

(iv)     With the exception of services actually performed by Tapper at Brownsville, Tahir at Bradford, Komerath at Cornell, Demetrius at D&H, Vershvovsky at Flatbush, and Tsinberg at Saturn, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Allstate that the Clinic Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Clinic Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Clinic Defendants' employees.

## IV.   The Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance

256.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Allstate.

257.    To induce Allstate to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

258.    Specifically, they knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery that the Clinic Defendants unlawfully paid kickbacks for patient referrals.

259.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent Allstate from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted.

260.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, physical therapists, acupuncturists, and technicians associated with the Clinic Defendants in order to prevent Allstate from discovering that the physicians, physical therapists, acupuncturists, and technicians performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the Clinic Defendants.

261.    Allstate maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

262.    In accordance with the No-Fault Laws, and Allstate's standard office practices and procedures, Allstate either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted by or on behalf of the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet Allstate failed to obtain compliance with the requests for additional verification), and, therefore, Allstate's time to pay or deny the claims has not yet expired.

263.    The Defendants hired law firms to pursue collection of the fraudulent charges from Allstate and other insurers. These law firms routinely filed expensive and time-consuming litigation against Allstate and other insurers if the charges were not promptly paid in full.

264.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation

activity described above, were designed to and did cause Allstate to rely upon them. As a result, Allstate incurred damages of more than $3,045,000.00 based upon the fraudulent charges.

265.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Allstate, Allstate did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION AGAINST THE PC DEFENDANTS
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

266.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 265 above.

267.    There is an actual case in controversy between Allstate and the PC Defendants as to more than $1,859,000.00 in pending fraudulent charges for the Fraudulent Services that have not been paid.

268.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate for the Fraudulent Services because the Fraudulent Services were not medically necessary and in many cases were not performed in the first instance.

269.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

270.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because, in many cases, the Fraudulent Services never were provided in the first instance.

271.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Allstate.

272.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Clinic Defendants and others.

273.    The PC Defendants have no right to receive payment for any pending bills submitted to Allstate because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Clinic Defendants' employees.

274.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to Allstate because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Allstate;

(iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Clinic Defendants and others; and

(v)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Clinic Defendants' employees.

## SECOND CAUSE OF ACTION AGAINST TAPPER
### (Violation of 18 U.S.C. § 1962(c))

275.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 274 above.

276.    Brownsville Advance Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

277.    Tapper knowingly has conducted and/or participated, directly or indirectly, in the conduct of Brownsville's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Brownsville was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Brownsville employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

278.   Brownsville's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tapper operates Brownsville, insofar as Brownsville is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Brownsville to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Brownsville to the present day.

279.   Brownsville is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Brownsville in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

280.   Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $460,000.00 pursuant to the fraudulent bills submitted through Brownsville.

281.   By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST BROWNSVILLE AND TAPPER
(Common Law Fraud)

61

282.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 281 above.

283.    Brownsville and Tapper intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

284.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Brownsville was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Tapper, the representation that the services were performed by Brownsville's employees, when in fact they were not.

285.    Brownsville and Tapper made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

286.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $460,000.00 based upon the fraudulent charges.

287.    Brownsville's and Tapper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

288.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION AGAINST BROWNSVILLE AND TAPPER
(Unjust Enrichment)

289.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

290.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

291.    When Allstate paid the bills and charges submitted by or on behalf of Brownsville for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

292.    The Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that the Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

293.    The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

294.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $460,000.00.

### FIFTH CAUSE OF ACTION AGAINST TAHIR
(Violation of 18 U.S.C. § 1962(c))

295.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 294 above.

296.    Bradford Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

297.    Tahir knowingly has conducted and/or participated, directly or indirectly, in the conduct of Bradford's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over four years seeking payments that Bradford was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Bradford employees, and in many cases were not performed at all.   A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

298.    Bradford's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tahir operates Bradford, insofar as Bradford is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Bradford to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bradford to the present day.

299.    Bradford is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Bradford in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

300.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $292,000.00 pursuant to the fraudulent bills submitted through Bradford.

301.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION AGAINST TAHIR AND TAPPER
(Violation of 18 U.S.C. § 1962(d))

302.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 301 above.

303.    Bradford Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

304.    Tahir and Tapper are employed by or associated with Bradford.

305.    Tahir and Tapper knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bradford enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than four years seeking payments that Bradford was not entitled to receive under the No-Fault Laws because the bills

misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Bradford employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

306.    Tahir and Tapper knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

307.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $292,000.00 pursuant to the fraudulent bills submitted through Bradford.

308.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION AGAINST BRADFORD AND TAHIR**
(Common Law Fraud)

309.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 308 above.

310.   Bradford and Tahir intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

311.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Bradford was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Tahir, the representation that the services were performed by Bradford's employees, when in fact they were not.

312.   Bradford and Tahir made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

313.   Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $292,000.00 based upon the fraudulent charges.

314.   Bradford's and Tahir's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

315.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION AGAINST TAPPER
(Aiding and Abetting Fraud)

316.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 315 above.

317.    Tapper knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Bradford and Tahir. The acts of Tapper in furtherance of the fraudulent scheme include knowingly recommending and purporting to perform medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Bradford and Tahir.

318.    The conduct of Tapper in furtherance of the fraudulent scheme is significant and material. The conduct of Tapper is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the recommendations for and purported performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Bradford and Tahir to obtain payment from Allstate and from other insurers.

319.    Tapper aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Bradford for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

320.    The conduct of Tapper caused Allstate to pay more than $292,000.00 based upon the fraudulent charges submitted through Bradford.

321.    Tapper's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

322.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION AGAINST BRADFORD, TAHIR, AND TAPPER
(Unjust Enrichment)

323.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 322 above.

324.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

325.    When Allstate paid the bills and charges submitted by or on behalf of Bradford for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

326.    The Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that the Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

327.    The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

328.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $292,000.00.

## TENTH CAUSE OF ACTION AGAINST KOMERATH
(Violation of 18 U.S.C. § 1962(c))

329.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 328 above.

330.    Cornell Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

331.    Komerath knowingly has conducted and/or participated, directly or indirectly, in the conduct of Cornell's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Cornell was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Cornell's employees, and in many cases were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

332.    Cornell's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Komerath operates Cornell, insofar as Cornell is not engaged in a

70

legitimate medical practice, and acts of mail fraud therefore are essential in order for Cornell to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Cornell to the present day.

333.     Cornell is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Cornell in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

334.     Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,042.000.00 pursuant to the fraudulent bills submitted through Cornell.

335.     By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION AGAINST KOMERATH AND RABINOVICI
### (Violation of 18 U.S.C. § 1962(d))

336.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 335 above.

337.     Cornell Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

338.     Komerath and Rabinovici are employed by or associated with Cornell.

339.    Komerath and Rabinovici knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Cornell enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than five years seeking payments that Cornell was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Cornell employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

340.    Komerath and Rabinovici knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

341.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,042.000.00 pursuant to the fraudulent bills submitted through Brownsville.

342.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION AGAINST KOMERATH AND CORNELL
(Common Law Fraud)

343.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 342 above.

344.    Komerath and Cornell intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

345.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Cornell was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Komerath, the representation that the services were performed by Cornell's employees, when in fact they were not.

346.    Komerath and Cornell made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

347.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $1,042.000.00 based upon the fraudulent charges.

348.    Komerath's and Cornell's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

349.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION AGAINST RABINOVICI
### (Aiding and Abetting Fraud)

350.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 349 above.

351.    Rabinovici knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Cornell and Komerath. The acts of Rabinovici in furtherance of the fraudulent scheme include knowingly recommending and purporting to perform medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Cornell and Komerath.

352.    The conduct of Rabinovici in furtherance of the fraudulent scheme is significant and material. The conduct of Rabinovici is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the recommendations for and purported performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing

reports, there would be no opportunity for Cornell and Komerath to obtain payment from Allstate and from other insurers.

353.    Rabinovici aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Cornell for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

354.    The conduct of Rabinovici caused Allstate to pay more than $1,042,000.00 based upon the fraudulent charges submitted through Cornell.

355.    Rabinovici's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

356.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION AGAINST KOMERATH, CORNELL, AND RABINOVICI
(Unjust Enrichment)

357.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 356 above.

358.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

359.    When Allstate paid the bills and charges submitted by or on behalf of Cornell for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

360.    The Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

361.    The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

362.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,042.000.00.

### FIFTEENTH CAUSE OF ACTION AGAINST DEMETRIUS
(Violation of 18 U.S.C. § 1962(c))

363.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 362 above.

364.    D&H Rehabilitation Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

365.    Demetrius knowingly has conducted and/or participated, directly or indirectly, in the conduct of D&H's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that D&H was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by D&H employees, and in

76

many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

366.   D&H's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Demetrius operates D&H, insofar as D&H is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for D&H to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through D&H to the present day.

367.   D&H is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by D&H in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

368.   Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $340,000.00 pursuant to the fraudulent bills submitted through D&H.

369.   By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION AGAINST DEMETRIUS AND D&H
(Common Law Fraud)

370.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 369 above.

371.   Demetrius and D&H intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

372.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that D&H was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Demetrius, the representation that the services were performed by D&H's employees, when in fact they were not.

373.   Demetrius and D&H made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

374.   Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $340,000.00 based upon the fraudulent charges.

375.     Demetrius' and D&H's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

376.     Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION AGAINST DEMETRIUS AND D&H
(Unjust Enrichment)

377.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 376 above.

378.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

379.     When Allstate paid the bills and charges submitted by or on behalf of D&H for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

380.     The Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

381.     The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

382.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $340,000.00.

## EIGHTEENTH CAUSE OF ACTION AGAINST VERSHVOVSKY
(Violation of 18 U.S.C. § 1962(c))

383.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 382 above.

384.    Flatbush Medical Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

385.    Vershvovsky knowingly has conducted and/or participated, directly or indirectly, in the conduct of Flatbush's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Flatbush was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Flatbush employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

386.    Flatbush's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Vershvovsky  operates Flatbush, insofar as Flatbush is not engaged in a

legitimate medical practice, and acts of mail fraud therefore are essential in order for Flatbush to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Flatbush to the present day.

387.    Flatbush is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Flatbush in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

388.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through Brownsville.

389.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION AGAINST VERSHVOVSKY, ABDALLA AND ARTAMONOV
### (Violation of 18 U.S.C. § 1962(d))

390.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 389 above.

391.    Flatbush Medical Care, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

392.    Vershvovsky, Abdalla, and Artamonov are employed by or associated with Flatbush.

81

393.    Vershvovsky, Abdalla, and Artamonov knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Flatbush enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than five years seeking payments that Flatbush was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Flatbush employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

394.    Vershvovsky, Abdalla, and Artamonov knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

395.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through Brownsville.

396.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION AGAINST FLATBUSH AND VERSHVOVSKY
### (Common Law Fraud)

397.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 396 above.

398.    Vershvovsky and Flatbush intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

399.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Flatbush was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by anyone other than Vershvovsky, the representation that the services were performed by Flatbush's employees, when in fact they were not.

400.    Vershvovsky and Flatbush made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

401.   Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, has incurred damages of more than $600,000.00 based upon the fraudulent charges.

402.   Vershvovsky's and Flatbush's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

403.   Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION AGAINST ABDALLA AND ARTAMONOV**
(Aiding and Abetting Fraud)

404.   Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 403 above.

405.   Abdalla and Artamonov knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Flatbush and Vershvovsky. The acts of Abdalla and Artamonov in furtherance of the fraudulent scheme include knowingly recommending and purporting to perform medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Flatbush and Vershvovsky.

406.   The conduct of Abdalla and Artamonov in furtherance of the fraudulent scheme is significant and material. The conduct of Abdalla and Artamonov is a necessary part of and is critical to the success of the fraudulent scheme because without his actions, including the recommendations for and purported performance of the fraudulent EDX Tests and the issuance

of the fraudulent EDX Testing reports, there would be no opportunity for Flatbush and Vershvovsky to obtain payment from Allstate and from other insurers.

407.    Abdalla and Artamonov aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Flatbush for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

408.    The conduct of Abdalla and Artamonov caused Allstate to pay more than $600,000.00 based upon the fraudulent charges submitted through Flatbush.

409.    Abdalla and Artamonov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

410.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION AGAINST FLATBUSH, VERSHVOVSKY, ABDALLA, AND ARTAMONOV
(Unjust Enrichment)

411.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 410 above.

412.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

413.    When Allstate paid the bills and charges submitted by or on behalf of Flatbush for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

85

414.     The Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

415.     The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

416.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $600,000.00.

**TWENTY-THIRD CAUSE OF ACTION AGAINST TSINBERG**
(Violation of 18 U.S.C. § 1962(c))

417.     Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 416 above.

418.     Saturn Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

419.     Tsinberg knowingly has conducted and/or participated, directly or indirectly, in the conduct of Saturn's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Saturn was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Saturn employees, and in

many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

420.    Saturn's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tsinberg operates Saturn, insofar as Saturn is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Saturn to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Saturn to the present day.

421.    Saturn is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Allstate and other insurers. These inherently unlawful acts are taken by Saturn in pursuit of inherently unlawful goals – namely, the theft of money from Allstate and other insurers through fraudulent No-Fault billing.

422.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $314,000.00 pursuant to the fraudulent bills submitted through Saturn.

423.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION AGAINST TSINBERG AND ABDALLA
(Violation of 18 U.S.C. § 1962(d))

424.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 423 above.

425.    Saturn Medical, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

426.    Tsinberg and Abdalla are employed by and/or associated with Saturn.

427.    Tsinberg and Abdalla knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Saturn enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than five years seeking payments that Saturn was not entitled to receive under the No-Fault Laws because the bills misrepresented and exaggerated the level and nature of the Fraudulent Services that were provided, and because the billed-for Fraudulent Services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants, were performed and billed pursuant to kickbacks, were performed by independent contractors rather than by Saturn employees, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Allstate that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

428.    Tsinberg and Abdalla knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Allstate and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Allstate.

429.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $314,000.00 pursuant to the fraudulent bills submitted through Brownsville.

430.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION AGAINST SATURN AND TSINBERG
(Common Law Fraud)

431.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 430 above.

432.    Tsinberg and Saturn intentionally and knowingly made false and fraudulent statements of material fact to Allstate by submitting, or causing to be submitted, hundreds of fraudulent bills for the Fraudulent Services.

433.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that Saturn was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it paid kickbacks for patient referrals; (iii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (iv) in every claim for services provided by

89

anyone other than Tsinberg, the representation that the services were performed by Saturn's employees, when in fact they were not.

434.    Tsinberg and Saturn made false and fraudulent statements and concealed material facts in a calculated effort to induce Allstate to pay charges that were not compensable under the No-Fault Laws.

435.    Allstate justifiably relied on the Defendants' false and fraudulent representations, and, as a proximate result, have incurred damages of more than $314,000.00 based upon the fraudulent charges.

436.    Tsinberg's and Saturn's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

437.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SIXTH CAUSE OF ACTION AGAINST ABDALLA
(Aiding and Abetting Fraud)

438.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 437 above.

439.    Abdalla knowingly aided and abetted the fraudulent scheme that was perpetrated on Allstate by Saturn and Tsinberg. The acts of Abdalla in furtherance of the fraudulent scheme include knowingly recommending and purporting to perform medically unnecessary EDX Tests and issuing fraudulent reports in exchange for payment of money from Saturn and Tsinberg.

440.    The conduct of Abdalla in furtherance of the fraudulent scheme is significant and material. The conduct of Abdalla is a necessary part of and is critical to the success of the

fraudulent scheme because without his actions, including the recommendations for and purported performance of the fraudulent EDX Tests and the issuance of the fraudulent EDX Testing reports, there would be no opportunity for Saturn and Tsinberg to obtain payment from Allstate and from other insurers.

441.    Abdalla aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying charges to Saturn for medically unnecessary services that were not compensable under New York's No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

442.    The conduct of Abdalla caused Allstate to pay more than $314,000.00 based upon the fraudulent charges submitted through Saturn.

443.    Abdalla's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

444.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION AGAINST SATURN, TSINBERG, AND ABDALLA
(Unjust Enrichment)

445.    Allstate incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 444 above.

446.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Allstate.

447.    When Allstate paid the bills and charges submitted by or on behalf of Saturn for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

448.    The Defendants have been enriched at Allstate's expense by Allstate's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

449.    The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

450.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $314,000.00.

## JURY DEMAND

451.    Pursuant to Federal Rule of Civil Procedure 38(b), Allstate demands a trial by jury.

**WHEREFORE**, Plaintiff Allstate Insurance Company demands that a Judgment be entered in its favor:

A.    On the First Cause of Action, declaring that the PC Defendants have no right to receive payment for any pending bills submitted to Allstate;

B.    On the Second Cause of Action against Tapper, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $460,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

C.    On the Third Cause of Action against Tapper and Brownsville, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $460,000.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.     On the Fourth Cause of Action against Tapper and Brownsville, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $460,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Tahir, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $292,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

F.     On the Sixth Cause of Action Tahir and Tapper, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $292,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

G.     On the Seventh Cause of Action against Tahir and Bradford, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $292,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Tapper, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $292,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.     On the Ninth Cause of Action against Bradford, Tahir, and Tapper, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $292,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Komerath, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $1,042,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

K.      On the Eleventh Cause of Action against Komerath and Rabinovici, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $1,042,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Komerath and Cornell, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $1,042,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Rabinovici, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $1,042,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Komerath, Cornell, and Rabinovici, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $1,042,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Demetrius, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $340,000.00, together with

94

treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

P.      On the Sixteenth Cause of Action against Demetrius and D&H, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $340,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Demetrius and D&H, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $340,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Vershvovsky, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Vershvovsky, Abdalla and Artamonov, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Vershvovsky and Flatbush, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Abdalla and Artamonov, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of

$600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V.     On the Twenty-Second Cause of Action against against Flatbush, Vershvovsky, Abdalla, and Artamonov, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $600,000.00, plus costs and interest and such other and further relief as this Court deems just and proper;

W.     On the Twenty-Third Cause of Action against Tsinberg, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $314,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.     On the Twenty-Fourth Cause of Action Tsinberg and Abdalla, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $314,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.     On the Twenty-Fifth Cause of Action against Tsinberg and Saturn, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $314,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Z.     On the Twenty-Sixth Cause of Action against Abdalla, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $314,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

AA.    On the Twenty-Seventh Cause of Action against Saturn, Tsinberg, and Abdalla, compensatory damages in favor of Allstate an amount to be determined at trial but in excess of $314,000.00, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:      Uniondale, New York
            September 15, 2014

RIVKIN RADLER LLP

By:_____
        Barry I. Levy (BL 2190)
        Max Gershenoff (MG 4648)
        Ryan Goldberg (RG 7570)
926 RXR Plaza
Uniondale, New York 11556-0926
Telephone:    (516) 357-3000
Facsimile:    (516) 357-3333

*Counsel for Plaintiff Allstate Insurance Company*

2943985 v1

97